IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

TINA HEARD, individually and on behalf of )
  all others similarly situated, )
  819 21st Street, N.E., )
  Washington, D.C. 20002; )
                                )

PEARLINE SNOW, individually and on behalf )
  of all others similarly situated, )
  2301 11th Street, N.W., )
  Washington, D.C. 20001; )
                                )

  and )    Civil Action No. _____
                                )

CAROLYN GRAHAM, individually and on )    CLASS ACTION COMPLAINT
  behalf of all others similarly situated, )
  1355 Perry Place, N.W., )
  Washington, D.C. 20010, )
                                )

                    Plaintiffs, )

                  v. )

UNITED STATES SOCIAL SECURITY )
ADMINISTRATION, )
  6401 Security Boulevard, )
  Baltimore, MD 21235-6401; )
                                )

UNITED STATES DEPARTMENT OF THE )
TREASURY, )
  1500 Pennsylvania Ave., N.W., )
  Washington, D.C. 20220; )
                                )

  and )

DISTRICT OF COLUMBIA, )
  c/o Office of the Attorney General )
  441 4th Street, N.W., )
  Washington, D.C. 20001, )
                                )

                    Defendants. )

_____ )

Plaintiffs Tina Heard, Pearline Snow, and Carolyn Graham have filed this action, individually and on behalf of all other persons who are similarly situated, to challenge Defendants' unlawful appropriation of Plaintiffs' tax refunds. The tax refunds were appropriated as offsets against debts allegedly owed to Defendant United States Social Security Administration ("SSA"). The debt claims are based on SSA's alleged overpayment of Social Security benefits to Plaintiffs more than twenty years ago. In appropriating Plaintiffs' current tax refunds to remedy these ancient debt claims, Defendants have violated notice requirements established by federal law, relied on unlawful retroactive regulations, and acted without a legally sufficient supporting rationale. Like most Americans, Plaintiffs counted on their tax refunds for rent, tuition for their children's education, and other essential living expenses and suffered extreme hardship as a result of Defendants' unlawful actions. The Court should set aside the tax refund offsets, declare that they are unlawful, and enjoin Defendants from implementing unlawful offsets in the future.

## JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction under 28 U.S.C. § 1331, because all of Plaintiffs' claims arise under the Constitution or laws of the United States. In addition, Plaintiffs' claims do not fall within the limitation on section 1331 federal question jurisdiction set forth in the Social Security Act, 42 U.S.C. § 405(h). Plaintiffs' claims challenge agency actions of Defendant SSA referring alleged debts to Defendant United States Department of the Treasury ("Treasury Department") for tax refund offsets. Plaintiffs' claims also challenge agency actions by Defendants Treasury Department and District of Columbia effectuating such offsets. None of these actions by Defendants is subject to administrative or judicial review under the Social Security Act, 42 U.S.C. § 405(g). *See* 20 C.F.R. §§ 404.902, 404.903.

2.      In the alternative, to the extent that 42 U.S.C. § 405(h) precludes section 1331 federal question jurisdiction over Plaintiffs' claims, the Court has jurisdiction under 42 U.S.C. § 405(g).  Plaintiffs have presented their claims for relief to SSA.  In addition, any obligation to exhaust administrative remedies either does not apply to Plaintiffs' claims, has been waived by SSA by taking action against Plaintiffs without affording them administrative remedies, or should be excused by the Court because, among other things, exhaustion would be futile.

3.      Venue in this District is proper under 28 U.S.C. § 1391(e)(1)(C), because Plaintiffs reside in the District of Columbia.

**PARTIES**

4.      Plaintiff Tina Heard is a fifty-four-year-old resident of the District of Columbia. She brings this action on behalf of herself and all others similarly situated.

5.      Plaintiff Pearline Snow is a sixty-one-year-old resident of the District of Columbia.  She brings this action on behalf of herself and all others similarly situated.

6.      Plaintiff Carolyn Graham is a fifty-one-year-old resident of the District of Columbia.  She brings this action on behalf of herself and all others similarly situated.

7.      Defendant SSA is responsible for administering Title II of the Social Security Act and for adopting and implementing regulations under that title.  SSA has harmed Plaintiffs by unlawfully referring their alleged overpayment debts to Defendant Treasury Department for tax refund offset, among other things without legally required notice.

8.      Defendant Treasury Department is responsible for administering the Treasury Offset Program and for adopting and implementing regulations governing the offset of tax refund payments to collect nontax debt.  The Treasury Department has harmed Plaintiffs through unlawful non-discretionary ministerial actions effectuating offsets of their tax refunds.

2

9.     Defendant District of Columbia has entered into a State Reciprocal Agreement with the Treasury Department pursuant to D.C. Code § 47-143 (2011), under which the District of Columbia Mayor has the statutory authority to authorize the offset of District of Columbia tax refunds owed to debtors who owe delinquent debts to federal agencies such as SSA.  The District of Columbia has harmed Plaintiffs through unlawful non-discretionary ministerial actions effectuating offsets of their tax refunds.

## CLASS ACTION ALLEGATIONS

10.     Plaintiffs Tina Heard, Pearline Snow, and Carolyn Graham bring this complaint on behalf of themselves and as representatives of a class of similarly situated persons pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

11.     This case involves old-age, survivors, and disability benefits created under Title II of the Social Security Act ("Social Security benefits" or "Title II benefits"), administered by SSA.  The following individuals are eligible for such benefits: (a) workers who have become elderly and/or disabled; (b) dependents of workers who have become elderly and/or disabled, including their spouses, divorced spouses, or children; and (c) workers' survivors, including widows, widowers, divorced spouses, children, and parents.  *See* 20 C.F.R. §§ 404.301-404.374.

12.     If a recipient of Social Security benefits is a minor child (or is an adult who is legally incompetent, or physically or mentally incapable of managing his or her benefits), SSA will appoint a representative payee to manage the beneficiary's benefits.  *See* 20 C.F.R. § 2010. If SSA overpays a beneficiary who has a representative payee, SSA regulations presume (absent certain circumstances) that the representative payee and the beneficiary are jointly and severally liable for repayment of the overpayment.  *See* 20 C.F.R. § 404.502; SSA Program Operations Manual ("POMS") GN 02205.007.

3

13.     The proposed class consists of all individuals who:

(a)     received Social Security benefits: (i) on their own behalf as workers, dependents of workers, and/or as survivors of workers; and/or (ii) as representative payees on behalf of workers, dependents of workers, and/or survivors of workers; and

(b)     were allegedly overpaid benefits themselves or were the representative payees of allegedly overpaid beneficiaries; and

(c)     SSA has determined were liable for repaying Social Security benefit overpayment debts that accrued before November 21, 2001; and

(d)     had tax refunds offset to repay these alleged debts; and

(e)     did not receive actual notice from SSA before Defendants intercepted their tax refunds, or had alleged debts referred by SSA for tax refund offset without a legally sufficient supporting rationale, or both.

14.     Excluded from this class is any judge assigned to hear this case (or any spouse or family member of any assigned judge), or any juror selected to hear this case.

15.     On information and belief, Plaintiffs allege that the class is so numerous that joinder of all class members is impracticable.  The precise number of members of the class and their addresses are presently unknown to Plaintiffs.  Public statements made by SSA suggest that in November 2011, SSA determined that 400,000 people allegedly had debts based on alleged overpayments that were more than ten years old.  Therefore, the class may consist of as many as 400,000 persons.  The precise number of persons in the class and their identities may be ascertained from Defendants' records.

16.     There are questions of law and fact common to all class members that predominate over questions only affecting individual class members, including whether:

(a)     the Treasury Department's extension of the tax refund offset remedy to alleged debts previously exempt from the remedy was an unlawful retroactive rule that Congress did not expressly authorize;

(b)     SSA's referrals to the Treasury Department of alleged debts previously exempt from the offset remedy arose from an unlawful retroactive rule that Congress did not expressly authorize;

(c)     SSA had a practice of referring alleged debts to the Treasury Department for tax refund offset in a way that violated the notice requirements of 20 C.F.R. § 404.521 and 31 U.S.C. § 3720A;

(d)     SSA had a practice of referring alleged debts to the Treasury Department for tax refund offset in a way that violated the notice requirements of the Due Process Clause of the Fifth Amendment to the U.S. Constitution; and

(e)     SSA's actions referring alleged debts for tax refund offset without an adequate supporting rationale were arbitrary and capricious and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706.

17.     Plaintiffs' claims are typical of the claims of all class members, they arise from the same course of conduct by one or more Defendants, and the relief sought is common to all class members.  Plaintiffs' claims are typical of the claims of the proposed class in the following ways:

(a)     Plaintiffs are members of the proposed class;

(b)     Plaintiffs' claims arise from the same rules, procedures, practices, and course of conduct on the part of one or more Defendants;

(c)      Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed class and involve similar factual circumstances;

(d)      the injuries suffered by named Plaintiffs are similar to the injuries suffered by the proposed class members; and

(e)      Plaintiffs seek a common form of relief for themselves and the members of the class.

18.     Plaintiffs are adequate representatives of the class on whose behalf this action is prosecuted.  Plaintiffs' interests do not conflict with the interests of the class.

19.     Plaintiffs' counsel have experience handling the types of claims asserted in this action and will fairly and adequately represent the interests of the class and prosecute this action vigorously.

20.     A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

(a)      individual claims by the class members would be impracticable because the costs of pursuit of such claims would far exceed what any individual class member has at stake;

(b)      relatively little individual litigation has been commenced over the controversies alleged in this Complaint and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

(c)      the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy;

(d)      the proposed class is manageable, and no difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action;

(e)      the proposed class members are readily identifiable from Defendants' own records; and

(f)      prosecution of separate actions by individual members of the proposed class would create risk of inconsistent or varying adjudications with respect to individual members of the proposed class that would establish incompatible standards of conduct for Defendants.

21.      Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue their unlawful conduct which will result in further damage to Plaintiffs and the proposed class.

## STATUTORY AND REGULATORY BACKGROUND

### The Administrative Process for Overpayments

22.      Under the regulations governing the Social Security program, an "overpayment" occurs when a beneficiary receives a payment in excess of the amount that should have been paid under the Social Security Act.  Overpayments include payments when benefits should have been terminated or when no amount should have been paid for a given month.  20 C.F.R. § 404.501(a).

23.      SSA's regulations require the agency to make an initial determination regarding the overpayment when the agency learns that a beneficiary potentially has received an overpayment.  *Id*. § 404.902(j).

24.      To make an initial determination that there has been an overpayment, SSA must determine by a preponderance of the evidence (a) whether there has been an overpayment,

7

(b) whether the beneficiary is legally responsible for repaying the overpayment, and (c) the amount of the overpayment. *Id*. §§ 404.902(j),(k).

25.     After SSA makes an initial determination that the beneficiary is responsible for repaying an overpayment of a specific amount, SSA must immediately send a notice to the beneficiary that includes, among other things:  the overpayment amount (and how and when it occurred); a request for a full, immediate refund; an explanation of the right to request reconsideration of the fact and/or amount of the overpayment determination; an explanation of the right to request a waiver of the overpayment; instructions about forms available for requesting reconsideration; an explanation that if the individual does not request reconsideration within 30 days of the overpayment notice, recovery of the overpayment will begin; a statement that an SSA office will help the individual complete and submit forms for appeal; and a statement that the individual should notify SSA promptly if he or she wants reconsideration of the determination. *Id*. § 404.502a.

26.     All initial determination notices, including notices of overpayment, must be mailed to beneficiaries at their last known address. *Id*. § 404.904.

27.     When SSA notifies a beneficiary of an initial determination that he or she is responsible for repaying an overpayment, the beneficiary has appeal rights, including the right to ask SSA to reconsider its decision, the right to a hearing before an Administrative Law Judge ("ALJ"), the right to appeal the ALJ's decision to the Social Security Appeals Council, and the right to seek judicial review in federal court under the Social Security Act, 42 U.S.C. § 405(g). 20 C.F.R. § 404.900(a).

28.     At any time, the beneficiary can request a waiver of overpayment by establishing that:  (a) the beneficiary was not at fault for the overpayment and collection of the overpayment

would defeat the purpose of Title II; or (b) collection of the overpayment would be against equity and good conscience.  *See* 20 C.F.R. § 404.506.

**SSA's Collection of Debt Through Offset of Income Tax Refunds**

29.     When SSA determines that a beneficiary is liable to repay an overpayment that is "certain in amount, past due and legally enforceable," SSA may refer the overpayment to the Treasury Department for collection through offset of income tax refunds that are due to the beneficiary.  20 C.F.R. § 404.520(b); *see also* 31 C.F.R. § 285.2.  The offset may involve federal or state (including District of Columbia) income tax refunds.  The Treasury Department effectuates the offset of federal income tax refunds through non-discretionary ministerial actions. On referral from the Treasury Department, the District of Columbia effectuates the offset of District of Columbia income tax refunds through non-discretionary ministerial actions.

30.     Before referring the alleged overpayment debt to the Treasury Department for collection through tax refund offset, SSA must take additional procedural steps to give the beneficiary an opportunity to contest the debt.  20 C.F.R. § 404.520(a).

31.     For example, before referring the alleged overpayment debt to the Treasury Department for collection through tax refund offset, SSA is required to send a "written notice of intent" to the beneficiary that states, among other things, the amount of the overpayment; that SSA will request a reduction in the beneficiary's federal and state income tax refunds unless, within 60 days of the date of the notice, the beneficiary repays the overpayment, provides evidence that the overpayment is not past due or legally enforceable, or asks SSA to waive collection; that SSA will review any evidence presented that the overpayment is not past due or not legally enforceable; and that the beneficiary has the "right to inspect and copy [the SSA's] records related to the overpayment as determined by us."  *Id.* § 404.521(e).

32.     If, in response to the "written notice of intent," the beneficiary submits evidence (within 60 days) disputing that the overpayment occurred or that it was legally enforceable, or the beneficiary requests a waiver of the debt, SSA must conduct a hearing or review of the record and issue written findings that include a supporting rationale.  *Id*. § 404.523(a).  The referral of the alleged debt to the Treasury Department is suspended pending the outcome of SSA's review of the evidence presented on the existence or enforceability of the alleged debt and/or the request for waiver.  *Id.* § 404.525.

33.     If adverse to the beneficiary, the written findings provide the justification for SSA's action referring the alleged debt to the Treasury Department for tax refund offset.  The written findings supporting SSA's referral action constitute the final agency action of SSA with respect to the past-due status and enforceability of the overpayment debt.  *Id*. § 404.523(a).

34.     If, however, a beneficiary does not receive the "written notice of intent," he or she will be unable to timely submit evidence to SSA disputing that the overpayment occurred or that it was legally enforceable (and also will be unable to timely request a waiver of collection). When a beneficiary does not respond to the notice, SSA does not conduct a hearing or review of the record and does not issue written findings as described above.  Instead, SSA refers the alleged debt to the Treasury Department for tax refund offset without issuing written findings. *Id*. § 404.522(b).  Under these circumstances, SSA's action referring the debt to the Treasury Department constitutes the final agency action of SSA with respect to the past-due status and enforceability of the overpayment debt.

35.     Treasury Department regulations require that when SSA refers an overpayment debt for tax refund offset, SSA must certify, among other things, that the debt is past due and legally enforceable in the amount submitted to the Treasury Department.   31 C.F.R.

10

§ 285.2(d)(1)(i). In order to make such a certification, SSA must have an underlying rationale about why the debt is past due and legally enforceable in the amount submitted to the Treasury Department.

## Availability of Judicial Review Under the Social Security Act

36.      "Initial determinations" are the only actions subject to the additional agency review within SSA described above in paragraph 27.   20 C.F.R. § 404.902.   SSA's action referring an overpayment debt to the Treasury Department for tax refund offset (with or without findings) is not an "initial determination."  *See id*. §§ 404.902, 404.903(p), (u).  Therefore SSA's referral of an overpayment debt to the Treasury Department for tax refund offset (with or without findings as described in paragraphs 32-34 above) is not subject to the additional agency review within SSA described above in paragraph 27.

37.      Because SSA's referral of an overpayment debt to the Treasury Department for tax refund offset (with or without findings) is not an "initial determination," and is not subject to the additional agency review within SSA described above, SSA's referral action is not subject to judicial review under the Social Security Act, 42 U.S.C. § 405(g).  *See* 20 C.F.R. § 404.903. Accordingly, claims challenging the adequacy of notice with respect to SSA's referral action, the adequacy of the rationale underlying SSA's referral action, or other aspects of the lawfulness of SSA's referral action are not subject to judicial review under the Social Security Act, 42 U.S.C. § 405(g).  Because such claims against SSA are not subject to judicial review under the Social Security Act, claims against the Treasury Department or the District of Columbia effectuating tax refund offsets in response to SSA's referral actions are likewise not subject to judicial review under that Act.  Jurisdiction over such claims against SSA, the Treasury Department, and the District of Columbia arises only under 28 U.S.C. § 1331.

## ALLEGATIONS OF INDIVIDUAL PLAINTIFFS

### Tina Heard

38.     Plaintiff Tina Heard grew up in Washington, D.C., where she has resided for the past 54 years.  Heard currently lives at 819 21st Street NE in the District of Columbia and has lived at that address for over 15 years.

39.     Heard's mother, Pearl Cox, passed away in 1970, leaving two minor children, including 10-year-old Heard, who were eligible for Title II benefits as survivors.  Because Heard was a minor at the time, Heard's aunt, Dorothy Stith, was her representative payee and received and managed the monthly survivor benefits on Heard's behalf.

40.     At that time (and until the law changed in October 1982), dependent children were allowed to receive survivor benefits until the age of 18, or if they continued their education in a post-secondary school, until the age of 22.  Neither Heard nor Stith recalls exactly when Heard stopped receiving survivor benefits, but it was at least 30 years ago.

41.     Heard currently works at Friendship Public Charter School in Washington, D.C. Now and over the past approximately 35 years, Heard has worked in jobs that have required her to contribute to the Social Security system.

42.     Around the beginning of February 2014, Heard was expecting her federal and District of Columbia tax refunds, but she did not receive them.  Heard called her tax preparer, who told her that her tax refunds had been intercepted by SSA and that she would have to contact SSA to find out why her refunds had been intercepted.

43.     Heard called the 1-800 number for SSA's Processing Center.   The SSA representative with whom Heard spoke told Heard that her tax refunds had been intercepted by SSA, but was unable to tell her why the refunds were intercepted.  The SSA representative advised Heard to visit her local SSA office to obtain more information.  The SSA representative

also encouraged Heard to fill out a request for reconsideration and a waiver request, but warned that a waiver request would constitute an admission of liability.   Heard gave the SSA representative her current address during the call.

44.      After calling SSA's Processing Center, Heard received a notice from the Treasury Department Financial Management Service dated February 12, 2014.  The notice informed her that her $2,226 federal tax refund had been intercepted and applied to satisfy a debt that Heard allegedly owed to SSA and that, based on the interception of the $2,226 payment, Heard's current overpayment balance was $2,150.30 (meaning that Heard allegedly owed SSA that additional amount).  Prior to this time, Heard had no knowledge, and had no reason to know, that SSA contended she owed any debt, much less the amount of the alleged debt.

45.      The Treasury Department notice also said that SSA had previously sent notice to Heard at "the last address known to the Agency."  However, neither Heard nor Stith had received any prior notice from SSA concerning any alleged overpayment or any referral to the Treasury Department for collection of any debt.

46.      Stith is currently 90 years old and still resides at 114 Jefferson Street NW in the District of Columbia, the address at which Heard and Stith lived when Stith received survivor benefits on Heard's behalf.   On information and belief, this is Heard's last known address associated with the survivor benefits paid to Heard by SSA.

47.      After receiving the notice from Treasury dated February 12, 2014, Heard received a notice from SSA.  Although the notice was dated February 19, 2014, Heard received it before that date.  The payment stub attached to the notice erroneously listed Heard's name as "Tina L Cox."   Although Cox was the last name of Heard's late mother, Heard never shared this last name.

48.     The notice from SSA informed Heard that SSA had recently received $918 of a federal or state payment that Heard was due and applied it toward an overpayment of SSA benefits that Heard allegedly received.  The notice also said that, based on the interception of the $918 payment, Heard's current overpayment balance was $4,376.30.  The $918 payment was the entire District of Columbia tax refund to which Heard was entitled.

49.     On February 18, 2014, after receiving the February 19, 2014 notice from SSA, Heard went to SSA's Postal Plaza Office in the District of Columbia.  She met with a representative who was unable to tell Heard why or when she received the alleged overpayment to which the notice referred.

50.     On February 19, 2014, Heard returned to SSA's Postal Plaza office and spoke with a supervisor.  The supervisor told Heard that SSA was able to provide her with only the following information:  that the overpayment had accrued between the years of 1978 and 1981 when she continued to receive survivor benefits after the benefits should have terminated, and that the total amount of the overpayment was $5,583.

51.     The supervisor told Heard that SSA was unable to provide any additional information because the overpayment occurred before 2005 and SSA's system is unable to retrieve information on overpayments that existed before the year 2005.

52.     The supervisor also told Heard that she needed to file a request for reconsideration and a waiver request and that she needed to have an "advance notice of termination of child's benefits" form filled out by her former school.  The supervisor directed Heard to a clerk, and the clerk assisted Heard in filling out the request for reconsideration. Heard filed the request for reconsideration on February 19, 2014.  On February 27, 2014, Heard

received a notice from SSA informing her that SSA had received her request for reconsideration and that it would review her decision and contact her concerning the request.

53.  Heard next received a notice from SSA dated March 5, 2014.  The payment stub attached to this notice also erroneously listed Heard's name as "Tina L Cox."  The notice informed Heard that SSA had recently received $2,226 of a federal or state payment that she was due and applied it toward the overpayment of SSA benefits that Heard allegedly received.

54.  In May 2014, Heard's counsel filed a demand letter with the SSA on Heard's behalf requesting that the SSA:  (1) reimburse Heard for her intercepted federal and state (District of Columbia) tax refunds within sixty days on account of an unexplained alleged overpayment; (2) process Heard's request for reconsideration and provide Heard with notice that complies with SSA's POMS and regulations; and (3) refrain from any further recoupment of Heard's alleged overpayment until SSA has provided Heard with a proper overpayment notice.

55.  Heard's counsel followed up with SSA in the summer of 2014 and again in September 2014.  At those times, SSA told her counsel that the payment center would make a decision regarding Heard's case.  As of the filing of this Complaint, SSA has not contacted Heard or her counsel regarding her request for reconsideration or her counsel's demand letter.

**Pearline Snow**

56.  Plaintiff Pearline Snow grew up in Washington, D.C., where she has resided for the past sixty-one years.

57.  Snow's first husband passed away in 1983 or 1984, leaving Snow and her two sons eligible for Title II survivor benefits:  Snow was eligible for mother's benefits and her sons were eligible for child benefits.  In or around 1984, Snow began receiving $399 per month in Social Security survivor benefits on behalf of herself and her two children.

58.     Snow does not recall exactly when she stopped receiving SSA benefits on her own behalf.  On information and belief, Snow stopped receiving SSA benefits on behalf of her son Ernest sometime between 1987 and 1989 while Ernest was still in high school, and Snow stopped receiving SSA benefits on behalf of her son Melvin when Melvin graduated from high school in 1989.

59.     Snow is currently retired but has worked in jobs over the past approximately 43 years that have required her to contribute to the Social Security system.

60.     In March 2014, Snow received a notice from the District of Columbia.  The notice, which was dated March 13, 2014, informed Snow that, in accordance with a reciprocal agreement between the District of Columbia and the Treasury Department, $930 of the District of Columbia tax refund that she and her current husband were owed had been intercepted and applied to a debt that she allegedly owed to SSA.  Prior to this time, Snow had no knowledge, and no reason to know, that SSA contended she owed any debt.

61.     After receiving the March 13, 2014 notice, Snow called SSA's 1-800 number to inquire about the alleged debt.  The SSA representative informed her that no records were available to explain the basis for SSA's debt claim.

62.     Snow subsequently received a notice from the Treasury Department Financial Management Service dated March 27, 2014.  The notice informed her that the $1,611 federal tax refund owed to Snow and her current husband had been intercepted and applied to satisfy a debt that Snow allegedly owed to SSA.

63.     The notice also said that SSA had previously sent notice to Snow at "the last address known to the Agency."  Snow currently resides at 2301 11th Street NW in the District of Columbia and has lived at that address for over 14 years.  Long before intercepting her federal

16

and District of Columbia tax refunds, SSA knew that Snow lived at that address because, for many years prior to the interceptions, SSA had sent annual Social Security Earnings Statements to Snow at 2301 11th Street NW.  However, Snow never received any prior notice from SSA concerning any alleged overpayment or any referral to the Treasury Department for collection of any debt.

64.     On April 23, 2014, Snow's counsel filed a demand letter with SSA on Snow's behalf requesting that SSA promptly reimburse Snow for the $2,541 in federal and state tax refunds that it intercepted on account of an unexplained alleged overpayment.

65.     On April 24, 2014, Snow's counsel called William Shin of SSA's M Street Office to discuss the demand letter.  Shin confirmed that, although SSA's records on Snow were incomplete, the available records did not show that Snow was sent an overpayment notice or any other notice before her tax refunds were offset.  Other information Shin provided was inconsistent and nonsensical.  He stated that Snow's overpayment did not occur until 2009, but that Snow might have entered into an agreement in 1990 to pay SSA $316 a month to reimburse SSA for the overpayment.  Shin was unable to provide more information and said that he would refer Snow's case to SSA's Payment Center, which would make a decision on the matter.

66.     As of the filing of this Complaint, SSA has not provided more information or made a decision on Snow's matter.

**Carolyn Graham**

67.     Carolyn Graham grew up in Washington, D.C., where she has resided for the past 51 years.

68.     Graham's father passed away on December 25, 1971, leaving Graham eligible for Title II survivor benefits.  Because Graham was a minor at the time, Graham's late mother was

her representative payee, and received and managed the monthly survivor benefits on Graham's behalf until Graham turned 18.

69.    After Graham turned 18 on August 22, 1982, she received SSA benefits on her own behalf until December 1982, when she received her last benefits check.

70.    After graduating from high school, Graham enrolled in a key punch school and subsequently enrolled in the Chesapeake Business Institute.  Because Graham was enrolled in post-secondary school, she was entitled to receive benefits after she turned 18.

71.    Long after she had stopped receiving survivor benefits on her own behalf, Graham became the representative payee for her son, who received survivor benefits after his father passed away on April 19, 1996.  Graham received survivor benefits on behalf of her son until October 2003 when her son turned 18.

72.    Graham currently works part-time at Pinkberry.   Now and over the past approximately 35 years, Graham has worked in jobs that have required her to contribute to the Social Security system.

73.    In early March 2014, Graham's federal and state (District of Columbia) tax refunds were directly deposited into her bank account.  Graham's District of Columbia tax refund was supposed to be $1,800, but she noticed that it was only $1,556.

74.    Graham subsequently received a notice from the Treasury Department Financial Management Service dated March 6, 2014.  The notice informed her that $244 of her federal tax refund had been intercepted and applied to satisfy a debt that Graham allegedly owed to SSA.  Prior to this time, Graham had no knowledge, and no reason to know, that SSA contended she owed any debt.

75.     The notice also said that SSA had previously sent notice to Graham at "the last address known to the Agency."  However, Graham never received any prior notice from SSA concerning any alleged overpayment or any referral to the Treasury Department for collection of any debt.  Graham currently resides at 1355 Perry Place NW in the District of Columbia and has lived at that address for over 20 years.  On information and belief, SSA has known that Graham lives at that address because, for the past 15 to 20 years, SSA has sent annual Social Security Earnings Statements to Graham at 1355 Perry Place NW.  In addition, SSA has known that Graham lives at that address because, up until October 2003, Graham received survivor benefits on her son's behalf at her 1355 Perry Place NW address.

76.     Shortly after receiving the March 6, 2014 notice from the Treasury Department, Graham received a notice from the District of Columbia.  The notice, which was also dated March 6, 2014, informed Graham that, in accordance with a reciprocal agreement between the District of Columbia and the Treasury Department, $244 of the District of Columbia tax refund owed to Graham had been intercepted and applied to a debt that she allegedly owed to SSA.

77.     After receiving these notices, Graham went to SSA's field office and met with a representative.  The SSA representative told her that the tax refund offset was due to an overpayment she received on her survivor benefits and that SSA could collect it regardless of how much time had passed; however, he was unable to provide any additional information.

78.     The SSA representative gave Graham a form to fill out to request a hearing, and Graham filed the request for a hearing that same day.

79.     Over the next few months, Graham called SSA's 1-800 number several times, but the SSA representatives were unhelpful and merely told her that SSA can intercept her tax refunds at any time.

80.     Bread for the City (a District-based legal services organization) contacted SSA regarding Graham's case in November 2014.  At that time, SSA confirmed that the alleged overpayment was on Graham's late father's record for survivor benefits.  SSA also told Bread for the City that the overpayment is no longer listed on Graham's father's account.

81.     When Bread for the City contacted SSA in November 2014, SSA could not locate Graham's hearing request in its system.  Bread for the City provided SSA with details regarding the hearing request and SSA agreed to backdate the request to March 2014 when it was originally filed.

82.     On January 8, 2015, Graham's current counsel filed a demand letter with SSA on Graham's behalf requesting that SSA promptly reimburse Graham for the $488 in federal and state tax refunds that it intercepted on account of an unexplained alleged overpayment and refrain from any further efforts to recoup alleged overpayments from Graham.

83.     Between January 12, 2015 and January 16, 2015, Graham's counsel and Asher Hoskins of SSA's M Street Office exchanged voicemail messages in an effort to set up a call to discuss Graham's case.

84.     On January 21, 2015, Graham's counsel received a voicemail message from Hoskins, in which Hoskins stated that he had instructed SSA's Payment Center to reimburse Graham for the tax refunds that it intercepted on account of an alleged overpayment.  Hoskins further stated that SSA would not pursue collection of the alleged overpayment through offset of Graham's 2015 tax refunds, but that SSA would likely pursue collection of the alleged overpayment in the future after Graham had been reimbursed.  Hoskins noted that SSA would discuss a waiver request with Graham's counsel at that point.

85.     On January 23, 2015, Bread for the City forwarded Graham's counsel copies of two letters that SSA's Postal Plaza office had provided to Bread for the City as Graham's representative.  Both letters had been sent from SSA and addressed to Graham at 1447 22nd Street, SE, an address at which Graham has not lived since 1987.  Graham did not receive either letter.  The first letter was dated March 19, 2014 and stated that SSA had recently received $244 of a federal or state payment that Graham was due and applied it toward an overpayment of SSA benefits that Graham allegedly received.  The notice also said that, based on the interception of the $244 payment, Graham's current overpayment balance was $0.  The second letter was dated April 7, 2014 and said that Graham would soon receive a check for $244 because she had "sent [SSA] too much money when [Graham] refunded [her] overpayment."

86.     As of the filing of this Complaint, Graham has not received any payment from SSA in connection with the alleged overpayment debt described above.

### Hardship to Plaintiffs

87.     Many lower income American taxpayers count on their federal and state tax refunds to pay their bills.  Not receiving an expected tax refund may create substantial hardship for such taxpayers.

88.     In Heard's case, for example, Defendants' interception of $3,144 in her expected federal and District of Columbia tax refunds forced her to borrow money to make payments for rent, her car loan, and her son's college tuition.

## COUNT I
## (VIOLATION OF 20 C.F.R. § 404.521)

89.     Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 88 above.

90.     20 C.F.R. § 404.521 provides: "Before [SSA] request[s] the collection of an overpayment by reduction of Federal and State income tax refunds, [SSA] will send a written notice of intent to the overpaid person."

91.     According to SSA, each of the Plaintiffs is an "overpaid person" as defined in 20 C.F.R. § 404.521, and as a result of being an "overpaid person," each of the Plaintiffs was entitled to written notice before SSA referred their accounts to the Treasury Department for collection through tax refund offset. 20 C.F.R. § 404.521.

92.     SSA is bound by the requirements of 20 C.F.R. § 404.521.

93.     Plaintiffs received no notice of the proposed tax refund offsets until after the offsets had been effectuated.

94.     SSA violated 20 C.F.R. § 404.521 by referring the accounts of Plaintiffs to the Treasury Department for tax refund offset without providing Plaintiffs with pre-offset notice at their last known addresses. These referrals by SSA, which were the consummation of the agency's decision-making process, directly harmed Plaintiffs by imposing adverse legal and economic consequences through tax refund offsets effectuated through the non-discretionary ministerial acts of Defendants Treasury Department and District of Columbia. These referrals by SSA in violation of 20 C.F.R. § 404.521 were final agency actions "without observance of procedure required by law" within the meaning of 5 U.S.C. § 706(2)(D).

95.     Under 5 U.S.C. § 706(2)(D), this Court should hold unlawful and set aside the tax refund offsets effectuated against Plaintiffs.

96.     Under 28 U.S.C § 2201, this Court should declare unlawful the tax refund offsets effectuated against Plaintiffs.

97.     Under 5 U.S.C. § 706(2)(D), this Court should enjoin SSA prospectively from referring additional alleged debts of Plaintiffs to the Treasury Department for tax refund offset without providing pre-offset notice at their last known addresses.  This Court also should enjoin Defendants Treasury Department and District of Columbia prospectively from offsetting additional tax refunds of Plaintiffs when they have not received pre-offset notice at their last known addresses.

## COUNT II
## (VIOLATION OF 31 U.S.C. § 3720A)

98.     Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 88 above.

99.     31 U.S.C. § 3720A prohibits an agency from referring a debt to the Treasury Department for a tax refund offset unless the agency first provides notice to the alleged debtor.

100.    Each of the Plaintiffs is a person alleged to have incurred a debt to a federal agency within the meaning of 31 U.S.C. § 3720A, and as a result, each was entitled to notice regarding the referral action SSA proposed to take regarding such debt.

101.    Plaintiffs received no notice of the proposed tax refund offsets until after the offsets had been effectuated.

102.    Defendants are bound by the notice requirements of 31 U.S.C. § 3720A.

103.    SSA violated 31 U.S.C. § 3720A by referring the accounts of Plaintiffs to the Treasury Department for tax refund offset without providing Plaintiffs with pre-offset notice at their last known addresses.   These referrals by SSA, which were the consummation of the

23

agency's decision-making process, directly harmed Plaintiffs by imposing adverse legal and economic consequences through tax refund offsets effectuated through the non-discretionary ministerial acts of Defendants Treasury Department and District of Columbia. These referrals by SSA in violation of 31 U.S.C. § 3720A were final agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of 5 U.S.C. § 706(2)(C).

104. Under 5 U.S.C. § 706(2)(C), this Court should hold unlawful and set aside the tax refund offsets effectuated against Plaintiffs.

105. Under 28 U.S.C § 2201, this Court should declare unlawful the tax refund offsets effectuated against Plaintiffs.

106. Under 5 U.S.C. § 706(2)(C), this Court should enjoin SSA prospectively from referring additional alleged debts of Plaintiffs to the Treasury Department for tax refund offset without providing pre-offset notice at their last known addresses. This Court also should enjoin Defendants Treasury Department and District of Columbia prospectively from offsetting additional tax refunds of Plaintiffs when they have not received pre-offset notice at their last known addresses.

**COUNT III**
**(VIOLATION OF DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT)**

107. Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 88 above.

108. The Due Process Clause of the Fifth Amendment to the Constitution prohibits Defendants from depriving any person of life, liberty, or property without due process of law.

109. Plaintiffs have a property interest in their federal and state (District of Columbia) tax refunds, which were seized through the tax refund offsets described above.

24

110.     Plaintiffs received no notice of the proposed tax refund offsets until after the offsets had been effectuated.

111.     The Due Process Clause required Defendants to provide Plaintiffs with notice that would be reasonably calculated, under all the circumstances, to apprise them of the proposed actions to be taken against them and their property, to afford them an opportunity to present their objections.

112.     On information and belief, SSA possessed Plaintiffs' current address information yet failed to send notices to those addresses before referring their alleged debts to the Treasury Department for tax refund offset.  As a result, any pre-offset notice provided by SSA to Plaintiffs was not reasonably calculated, under all the circumstances, to apprise Plaintiffs of the proposed actions to be taken against them and their property, to afford them an opportunity to present their objections.

113.     Even assuming *arguendo* that SSA did not have current address information for Plaintiffs, on information and belief the Internal Revenue Service ("IRS") did have such address information.  However, on information and belief, SSA did not obtain such address information from IRS or use such information in sending any notice before referring their alleged debts to the Treasury Department for tax refund offset.

114.     Congress has authorized SSA to obtain current address information for Plaintiffs from IRS.  26 U.S.C. § 6103(m)(2)(A) allows IRS addresses to be used for purposes of collecting federal claims pursuant to 31 U.S.C. § 3711, which governs the collection and compromise of claims and directs the government to attempt to collect a claim of the government "for money or property arising out of the activities of, or referred to, the agency."

115.    The Treasury Department's regulations also allowed SSA to obtain current address information from IRS for the purposes of the tax offset program.  As construed by the Treasury Department, 31 C.F.R. § 285.2 required SSA to use the most current address on file — whether that address was maintained by SSA itself or IRS.

116.    Because SSA did not obtain current address information from IRS or use such information for pre-offset notice, any pre-offset notice provided by SSA to Plaintiffs was not reasonably calculated, under all the circumstances, to apprise Plaintiffs of the proposed actions to be taken against them and their property, to afford them an opportunity to present their objections.

117.    SSA's referral of the accounts of Plaintiffs to the Treasury Department for tax refund offset without providing Plaintiffs with pre-offset notice at their current addresses violated their rights under the Due Process Clause of the Fifth Amendment to the Constitution.

118.    The non-discretionary ministerial actions of Defendants Treasury Department and District of Columbia effectuating tax refund offsets against Plaintiffs violated their rights under the Due Process Clause of the Fifth Amendment to the Constitution because such actions were not preceded by constitutionally-sufficient notice.

119.    This Court should hold unlawful and set aside the tax refund offsets effectuated against Plaintiffs.

120.    Under 28 U.S.C § 2201, this Court should declare unlawful the tax refund offsets effectuated against Plaintiffs.

121.    This Court should enjoin SSA prospectively from referring additional alleged debts of Plaintiffs to the Treasury Department for tax refund offset without providing pre-offset notice at their current addresses, when such addresses are known to one of the Defendants.  This

26

Court also should enjoin Defendants Treasury Department and District of Columbia prospectively from offsetting additional tax refunds of Plaintiffs when they have not received pre-offset notice at their current addresses, when such addresses are known to one of the Defendants.

## COUNT IV
## (UNLAWFUL RETROACTIVE AGENCY ACTION)

122.    Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 88 above.

123.    As of January 1, 1998, when the Treasury Department began conducting tax refund offsets through the Treasury Offset Program, SSA had authority to refer overpayment debt claims to the Treasury Department for tax refund offset only if the debt claims accrued within the previous ten years. *See* 20 C.F.R. § 404.520(b) (1998).  SSA's regulations precluded SSA from referring debt claims accruing before January 1, 1988 to the Treasury Department for tax refund offset.

124.    As of January 1, 1998, when the Treasury Department began conducting tax refund offsets through the Treasury Offset Program, the Treasury Department had authority to offset tax refunds only to collect on those debt claims that accrued within the previous ten years. 31 C.F.R. § 285.2(d)(1)(ii) (1998).  The Treasury Department's regulations precluded it from effectuating tax refund offsets to collect debt claims accruing before January 1, 1988.

125.    On November 21, 2011, SSA amended its regulations by revoking the ten-year limitations period for referrals of overpayment debt claims to the Treasury Department for tax refund offset.  In so doing, SSA authorized the referral of outstanding debt claims, like those against Plaintiffs, that accrued more than ten years earlier (i.e. before November 21, 2001) and therefore previously had not been subject to referral, to the Treasury Department, for tax refund

offset.  *See* 20 C.F.R. § 404.520(b) (2011).  In its Federal Register notice revoking the ten-year limitations period, SSA explicitly acknowledged that it was changing its regulations to allow SSA to "collect[ ] non-tax debts beyond the original 10-year statute of limitations," and that "[t]hese changes will allow us to collect additional Federal debt."  76 Fed. Reg. 65107 (Oct. 20, 2011).

126.    On December 28, 2009, the Treasury Department amended its regulations by revoking the ten-year limitations period for debt claims subject to tax refund offsets.  In so doing, the Treasury Department authorized tax refund offsets for outstanding debt claims, like those against Plaintiffs, which accrued more than ten years earlier (i.e. before December 28, 1999) and therefore previously had not been subject to tax refund offset.  31 C.F.R. § 285.2(d)(6)(i) (2009). In its Federal Register notice revoking the ten-year limitations period, the Treasury Department explicitly acknowledged that it was extending the offset remedy to "debts that were ineligible for collection by offset prior to the removal of the limitations period."  74 Fed. Reg. 68537 (Dec. 28, 2009).

127.    The 1996 Debt Collection Improvement Act of 1996, which established the Treasury Offset Program, does not expressly address retroactive imposition of a tax refund offset remedy.  In addition, no other federal statute expressly addresses retroactive imposition of a tax refund offset remedy.

128.    The SSA regulation revoking the ten-year limitation on debt claims subject to referral for tax refund offset (20 C.F.R. § 404.520(b) (2011)) is a retroactive rule, among other things, because it changes the law in a way that adversely affects beneficiaries' prospects for success in defending against collection of SSA debt claims accruing before November 21, 2001. SSA had no lawful authority to implement the retroactive rule, because Congress did not

expressly authorize the retroactive rule.  To the extent that it authorizes SSA to refer debt claims accruing before November 21, 2001 for tax refund offset, 20 C.F.R. § 404.520(b) (2011) is a final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of 5 U.S.C. § 706(2)(C).

129.     Because SSA had no lawful authority to implement the retroactive rule, and the debt claims against Plaintiffs accrued before November 21, 2001, SSA had no lawful authority to refer the debt claims against Plaintiffs to the Treasury Department for tax refund offset.  SSA's referrals of the alleged overpayment debts to the Treasury Department, which were the consummation of SSA's decision-making process, directly harmed Plaintiffs by imposing adverse legal and economic consequences through tax refund offsets effectuated through the non-discretionary ministerial acts of Defendants Treasury Department and District of Columbia. SSA's actions referring the debt claims against Plaintiffs to the Treasury Department for tax refund offset are final agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of 5 U.S.C. § 706(2)(C).

130.     The Treasury Department regulation revoking the ten-year limitation on debts subject to tax refund offset (31 C.F.R. § 285.2(d)(6)(i) (2009)) is a retroactive rule, among other things because it changes the law in a way that adversely affects beneficiaries' prospects for success in defending against collection on SSA debt claims accruing before December 28, 1999. The Treasury Department had no lawful authority to implement the retroactive rule, because Congress did not expressly authorize the retroactive rule.  To the extent that it authorizes the Treasury Department to offset tax refunds to collect on SSA debt claims accruing before December 28, 1999, 31 C.F.R. § 285.2(d)(6)(i) (2009) is a final agency action "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of 5 U.S.C. § 706(2)(C).

131.    Because the Treasury Department had no lawful authority to implement the retroactive rule, and the debt claims against Plaintiffs accrued before December 28, 1999, the Treasury Department had no lawful authority to collect on the debt claims against Plaintiffs through tax refund offset. The Treasury Department's offsets of Plaintiffs' federal tax refunds (and actions requesting the District of Columbia to offset District of Columbia tax refunds) in order to collect debts against Plaintiffs were the consummation of the Treasury Department's decision-making process and directly harmed Plaintiffs by imposing adverse legal and economic consequences.  Such offsets and actions constituted final agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of 5 U.S.C. § 706(2)(C).

132.    Under 5 U.S.C. § 706(2)(C), this Court should hold unlawful and set aside 20 C.F.R. § 404.520(b) (2011), to the extent that it authorizes SSA to refer debt claims accruing before November 21, 2001 for tax refund offset, and 31 C.F.R. § 285.2(d)(6)(i) (2009), to the extent that it authorizes the Treasury Department to offset tax refunds to collect on debt claims accruing before December 28, 1999.  Under 5 U.S.C. § 706(2)(C), this Court also should hold unlawful and set aside the tax refund offsets effectuated against Plaintiffs.

133.    Under 28 U.S.C. § 2201, this Court should declare unlawful 20 C.F.R. § 404.520(b) (2011), to the extent that it authorizes SSA to refer debt claims accruing before November 21, 2001 for tax refund offset, and 31 C.F.R. § 285.2(d)(6)(i) (2009), to the extent that it authorizes the Treasury Department to offset tax refunds to collect on debt claims accruing

before December 28, 1999.  Under 28 U.S.C. § 2201, this Court also should declare unlawful the tax refund offsets effectuated against Plaintiffs.

134.    Under 5 U.S.C. § 706(2)(C), this Court should enjoin SSA prospectively from referring additional debt claims against Plaintiffs to the Treasury Department for tax refund offset, under the authority of 20 C.F.R. § 404.520(b) (2011) or otherwise, if the debt claims accrued before November 21, 2001.  This Court also should enjoin Defendants Treasury Department and District of Columbia prospectively from offsetting additional tax refunds of Plaintiffs, under the authority of 31 C.F.R. § 285.2(d)(6)(i) (2009) or otherwise, if the underlying debt claims accrued before December 28, 1999.

## COUNT V
## (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

135.    Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 88 above.

136.    Pursuant to 31 C.F.R. § 285.2(d)(1)(i), when SSA refers an alleged overpayment debt to the Treasury Department for tax refund offset, SSA must certify that the debt is past due and legally enforceable.  Principles of rational agency decisionmaking enforced under the Administrative Procedure Act, 5 U.S.C. § 706, require that in order to make the required certification, and in order to conclude rationally that an alleged overpayment debt is eligible to be referred to the Treasury Department for tax refund offset, SSA must, at a minimum:

(a)    calculate the sum certain alleged to be overpaid and not previously recouped;

(b)    establish a rationale for why the recipients were not legally entitled to the benefits that were paid;

31

(c)      establish a rationale for why the debt is legally enforceable as to the specific taxpayer in question;

(d)      establish that the agency's determination of an overpayment was timely within SSA's own regulations (which require determining that there was in fact an overpayment within one year, or for good cause within four years, after the overpayment occurred (20 C.F.R. § 404.988)); and

(e)      confirm that SSA "immediately" notified the debtor upon making its overpayment determination in accordance with 20 C.F.R. § 404.502a and GN 02201.009.

137.    On information and belief, SSA's certifications to the Treasury Department regarding Plaintiffs' alleged overpayment debts either had no supporting rationale, or had an insufficient supporting rationale, establishing why Plaintiffs' alleged debts were past due and legally enforceable.   On information and belief, SSA's referrals of Plaintiffs' alleged overpayment debts to the Treasury Department either had no supporting rationale, or had an insufficient supporting rationale, establishing why Plaintiffs' alleged debts were past due and legally enforceable.

138.    SSA's referrals of Plaintiffs' alleged overpayment debts to the Treasury Department for tax refund offsets, which were the consummation of SSA's decision-making process, directly harmed Plaintiffs by imposing adverse legal and economic consequences through tax refund offsets effectuated through the non-discretionary ministerial acts of Defendants Treasury Department and District of Columbia.   Because they had no supporting rationale, or had an insufficient supporting rationale, these referrals were arbitrary and capricious final agency actions within the meaning of 5 U.S.C. § 706(2)(A).

139. Under 5 U.S.C. § 706(2)(A), this Court should hold unlawful and set aside the tax refund offsets effectuated against Plaintiffs.

140. Under 28 U.S.C. § 2201, this Court should declare unlawful the tax refund offsets effectuated against Plaintiffs.

141. Under 5 U.S.C. § 706(2)(A), this Court should enjoin SSA prospectively from referring additional alleged debts of Plaintiffs to the Treasury Department for tax refund offset without an adequate supporting rationale. This Court also should enjoin Defendants Treasury Department and District of Columbia prospectively from offsetting additional tax refunds of Plaintiffs without an adequate supporting rationale.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the Court to grant the following relief:

I.    Certify at an appropriate time that this suit is properly maintainable as a class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure;

II.    Hold unlawful and set aside the agency actions described in paragraphs 95, 104, 119, 132 and 139 above;

III.    Issue the declaratory judgment described in paragraphs 96, 105, 120, 133 and 140 above;

IV.    Issue the injunction described in paragraphs 97, 106, 121, 134 and 141 above;

V.    Grant the members of the class the same relief requested as to the named Plaintiffs in Prayer for Relief paragraphs II through IV above;

VI.    Award costs and reasonable attorneys' fees authorized by law; and

VII.    Award such other relief as this Court deems just and proper.

Respectfully submitted,

_/s/ Daniel G. Jarcho_____

Chinh Q. Le (D.C. Bar No. 1007037)       Daniel G. Jarcho (D.C. Bar No. 391837)
Jennifer Mezey (D.C. Bar No. 462724)     Felicia C. Quentzel (D.C. Bar No. 1015683)
Nina Wu (D.C. Bar No. 1000246)           Stephanie L. Ellis (D.C. Bar No. 981563)
Thomas C. Papson (D.C. Bar No. 962100)   MCKENNA LONG & ALDRIDGE LLP
LEGAL AID SOCIETY OF THE DISTRICT        1900 K Street NW
   OF COLUMBIA            Washington, D.C. 20006
1331 H St. NW, Suite 350                 Phone: 202-496-7500
Washington, D.C. 20005                   Fax: 202-496-7756
Phone: 202-628-1161
Fax: 202-727-2132

Attorneys for Plaintiffs Tina Heard, Pearline Snow and Carolyn Graham